UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. ) ) |
| ADAM R. LONG, L2 CAPITAL, LLC, and OASIS CAPITAL, LLC, | ) Jury Trial Demanded ) ) |
| Defendants. | ) ) |

# COMPLAINT

Plaintiff, Securities and Exchange Commission ("SEC"), alleges as follows:

## Summary

1. Beginning in November 2018, Defendants Adam R. Long ("Long"), L2 Capital, LLC ("L2"), and Oasis Capital, LLC ("Oasis") (collectively the "Defendants"), violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(a)(1). More specifically, Defendants Long, L2 and Oasis operated as securities dealers without registering with the SEC.

2. While acting as unregistered dealers, Defendants regularly engaged in the business of purchasing securities known as convertible promissory notes from small companies that needed cash and issued penny stocks ("penny stock" companies) or other shares that trade at very low prices ("microcap" companies). Defendants then converted those notes into publicly tradeable stock at a significant discount from prevailing market prices, and promptly sold those newly-issued shares into the public markets.

3. Utilizing this business model, Defendants engaged in at least 20 convertible note transactions, involving at least 15 different companies issuing stock, and acquired and sold more than 5.8 *billion* shares of stock into the public markets. Defendants' illegal activities generated at least $20 million in profits, while diluting the value of shares held by other shareholders.

4. None of the Defendants were registered with the SEC as broker-dealers, were associated with SEC-registered broker-dealers, or were otherwise exempt from registration with the SEC during the course of their conduct.

5. Accordingly, each of the Defendants have violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a). In the alternative, Long controlled L2 and Oasis during the time period at issue and may be held liable for their violations under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

6. The SEC seeks a permanent injunction against each of the Defendants, disgorgement of their ill-gotten gains on a joint and several basis, with prejudgment interest, a substantial civil penalty against each Defendant, and an order barring Defendants from participating in any future issuances of penny stocks.

## Jurisdiction and Venue

7. The Commission brings this action pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d). This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

8. Venue is proper in this Court pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, because Defendants transacted business in this district, and some of the acts, practices, and courses of business constituting the securities violations alleged herein occurred within this district. Defendants retained two contractors who reside and performed work for

Defendants within this District to assist them in the activities which constituted violations of the securities laws. There are also shareholder-victims who reside within this District.

### Defendants

9. **Adam R. Long** is a resident of Puerto Rico. He has substantial experience with, and knowledge about, the securities industry. At various times between 2003 and 2016, Long was associated with several broker-dealers registered with the SEC. Long previously held at least eight securities licenses.

10. **L2 Capital, LLC** is a Kansas limited liability company with its principal place of business in Dorado, Puerto Rico. Long has solely owned and controlled L2 since December 2018.

11. **Oasis Capital, LLC** is a Puerto Rico limited liability company with its principal place of business in Dorado, Puerto Rico. Long has solely owned and controlled Oasis since its formation in July 2018.

### Factual Allegations

12. During the entire period of time at issue in this case, Long owned, controlled and funded both L2 and Oasis. In addition, Long made all investment and trading decisions on behalf of both companies, including all of the transactions described below.

A. **Defendants' Convertible Note Strategy**

13. Beginning in November of 2018, Defendants regularly acquired convertible notes, which are a type of short-term debt security, from small companies that needed cash and issued penny stocks (penny stock companies) or other low-value securities (microcap companies). Because these issuers often had minimal assets, negative cash flows, and limited operating histories, Defendants were able to negotiate highly favorable terms for the convertible notes.

14. Defendants typically purchased convertible promissory notes with market-adjustable pricing, which allowed them to convert those notes into shares of stock of the issuing penny stock or microcap company at a discounted price that was a fraction of the lowest volume-weighted average share price within a given period ("Variable Convertible Note Transactions"). Those discounts generally ranged from 10 to 50 percent less than the lowest trading price of the stock in the 15 to 30 days preceding each conversion.

15. Defendants also obtained an original issuer's discount ("OID") when L2 and/or Oasis purchased a note. The amount of the OID varied, but typically was approximately 10 percent of the total note amount.

16. The face value of the notes Defendants obtained in the Variable Convertible Note Transactions ranged from a low of around $78,000 to a high of about $5 million. In addition, the penny stock and microcap companies often paid L2 or Oasis a fee of between $8,000 and $25,000, in each transaction, ostensibly to cover their transaction costs.

17. Defendants pursued Variable Convertible Note Transactions with companies that had high trading volumes in order to facilitate the Defendants' rapid sale of shares after conversion. For this same reason, Defendants also sought out penny stock and microcap companies that were current in their required SEC filings.

18. In most cases, the penny stock and microcap companies with whom L2 and Oasis entered into Variable Convertible Note Transactions did *not* make the required payments under the notes. So L2 and/or Oasis exercised the right to convert the amount due under the notes into newly-issued shares, and then sold the shares into the public market.

19. Defendants often converted debt to shares in small amounts, because the notes typically restricted Defendants' stock ownership to less than 5 percent or 10 percent of the issuer's outstanding shares.

20. Typically, Defendants began selling the converted company shares within three trading days after the shares were deposited into their brokerage accounts. But Defendants frequently sold shares on the same day, or the very next day, after the shares were deposited.

21. Once the newly-issued shares were deposited into Defendants' brokerage accounts, they often began selling immediately and sold on consecutive trading days until all the newly-issued shares were sold.

22. Defendants also aimed to limit their sales to a certain percentage of the daily trading volume in a company's stock, which generally was between 10 percent and 20 percent.

23. Because the Defendants usually sold the converted shares promptly after conversion, the majority of Defendants' profits from the Variable Convertible Note Transactions did not result from any appreciation of the stock prices. Instead, Defendants profited through the sale of shares they acquired at discounted prices upon conversation of the notes, as well as through the OID.

24. Defendants' repeated conversions of notes into stock, and their subsequent sales of newly-issued and freely-trading shares, significantly increased the amount of publicly-issued stock for each company that had issued the notes to Defendants. As a result, Defendants' sales diluted the value of the shares held by existing shareholders and frequently depressed the issuing companies' stock prices.

**B.     Defendants Represented Themselves as Securities Dealers**

25.     Defendants held themselves out to the public as dealers who were willing to buy convertible notes as part of their regular business operations, including through their websites, email and phone solicitations, and industry conference appearances. Long also relied upon a network of investment bankers, brokers and attorneys to find deals for L2 and Oasis.

26.     Between November 2018 and January 2019, L2 and Oasis solicited issuers to participate in Variable Convertible Note Transactions via email. Thereafter, L2 and Oasis primarily relied on Long's contacts in the financial industry to locate potential Variable Convertible Note Transactions.

27.     From early 2019 through September 2019, L2's website described the company as a private investment firm that engaged in convertible debt, preferred equity and discounted equity transactions. This website had an investment inquiry form and an email address that potential counterparties could use to contact L2. After September 2019, L2's website merely showed its logo, and later Oasis' logo, with no description of the businesses.

28.     Long also attended approximately 20 financial industry conferences during which he met with multiple penny stock and microcap issuers and marketed Defendants' interest in purchasing convertible notes. For example, on February 20, 2020, Long sent an email to representatives of an issuer, which stated: "Good seeing you guys this week. I hope you enjoyed the conference. Attached is a convertible note proposal."

29.     Long retained at least five independent contractors to help him identify potential Variable Convertible Note Transactions for L2 and Oasis. Long also retained two contractors, who lived and worked in the Northwest suburbs of Chicago, Illinois, to provide essential back-

office, accounting and trading services. These two contractors, and Long, received all emails sent to L2's and Oasis' general email addresses.

30. These back-office contractors were also responsible for communicating with transfer agents, broker-dealers and issuers (all of whom were subject to SEC registration requirements) and ensuring that L2 and Oasis acquired the shares converted from the Variable Convertible Note Transactions and were able to sell the shares into the public securities market. They tracked L2's and Oasis' ability to convert debt to shares, issued conversion notices, ensured that restrictions on the sale of shares were removed, and provided the information needed to ensure that free-trading shares were deposited into L2's and Oasis' accounts held at SEC-registered broker-dealers.

31. Long personally negotiated with the companies which issued penny stock and microcap stock for the purchase of the notes in the Variable Convertible Note Transactions. Long signed all of the corresponding agreements on behalf of L2 and Oasis.

    **C.**    **Long Transitioned His Business from L2 to Oasis**

32. In the middle of 2019, Long began to wind down L2's business operations as part of a plan to use Oasis for any future Variable Convertible Note Transactions. Long began this wind down after the SEC filed a lawsuit against Individual 1, who was his former business partner in L2. In fact, by December of 2018, Long had become aware that the SEC might file suit against Individual 1.

33. That lawsuit was *SEC v. River North Equity, LLC, et. al.,* Case No. 19-cv-1711, filed in April 2019 in the U.S. District Court for the Northern District of Illinois. Among other things, the SEC's complaint in *River North* alleged that Individual 1 and a company operated by Individual 1 had acted as unregistered securities dealers by purchasing convertible debt at a

7

discount from prevailing market prices and then selling millions of shares of stock to the public at market prices.

34. L2 continued to convert debt due under the convertible notes it owned into publicly-tradeable shares, and then sold the shares into the market to investors living throughout the United States, including in this District. L2 also assigned some convertible notes and shares converted through Variable Convertible Note Transactions to Oasis.

35. In late 2020 and early 2021, Defendants transitioned from trading primarily penny stocks and began targeting microcap issuers with stock trading on the Nasdaq stock market ("Nasdaq").

### D. Defendants' Activities As Unregistered Dealers Yielded Significant Profits

36. Defendants engaged in at least 20 Variable Convertible Note Transactions with at least 15 microcap or penny stock companies between November 2018 and August 2021. Defendants have converted and sold more than 5.8 *billion* shares of stock through Variable Convertible Note Transactions, nearly all of which were penny stocks.

37. Initially, Defendants mainly entered Variable Convertible Note Transactions with issuers of penny stocks trading on the Over-the-Counter ("OTC") market. In total, Defendants sold more than 5.75 billion shares of penny stocks.

38. Defendants often reaped significant profits on their Variable Convertible Note Transactions within a short period of time. For example, on December 2, 2019, Oasis acquired a Variable Convertible Note from Issuer 1 for up to $575,682. Oasis' purchase price for the Issuer 1 note was only $500,000, after deducting $68,182 for the OID and $7,500 for Oasis' transactional expenses.

39. However, according to Defendants' transaction records, Oasis made only an initial payment of $125,000 to Issuer 1 to obtain the note and did not pay the remainder of the purchase price. The 300,000 shares from the first conversion of debt were deposited into Oasis' brokerage account on August 31, 2020. Oasis began selling the shares the next day and sold all of the shares from that first conversion into the open market within ten days.

40. Oasis converted additional shares of stock from the Issuer 1 note on four more occasions through January 29, 2021. Each time Oasis converted more shares, it did so at a 25 percent discount from the lowest trading price in the 30 days before the conversion. In total, Oasis acquired and sold 5,161,851 shares from the Issuer 1 note and received net proceeds of $1,247,028.

41. Defendants' Variable Convertible Note Transactions generated at least $20 million in profits for L2 and Oasis. Defendants also significantly increased the amount of publicly-issued stock for each company that issued notes to Defendants, diluted the value of shares held by other shareholders, and frequently lowered those companies' stock prices.

42. As described above, Defendants acted as securities dealers because they regularly purchased and sold securities as part of a regular business. Defendants did not qualify for any statutory exemption from registration, and should have registered as dealers with the SEC.

43. By failing to register with the SEC as dealers under the Exchange Act, Defendants evaded important protections to investors and the markets, including obligations that promote market stability. Defendants also avoided complying with important regulatory requirements, including the obligation to disclose material information regarding business ownership and conflicts of interest, follow financial responsibility rules, maintain required books and records and join a national security exchange or self-regulatory organization ("SRO").

44. Defendants sold stock from small public companies that traded at less than five dollars per share and did not meet any of the exceptions from the definition of a "penny stock," as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51-1.

**Count I**
**Violations of Section 15(a)(1) of the Exchange Act**
**(Against All Defendants)**

45. The SEC incorporates and realleges paragraphs 1 through 44 as if fully set forth herein.

46. By engaging in the conduct described above, Defendants, acting as securities dealers, made use of the mails or means and instrumentalities of interstate commerce to affect transactions in, or induce or attempt to induce the purchase or sale of a security, without being registered with the SEC.

47. By reason of the foregoing, Defendants violated Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

**Count II**
**Violations of Section 15(a)(1) of the Exchange Act**
**In the Alternative Under Section 20(a) of the Exchange Act**
**(Against Long as a Control Person of L2 and Oasis)**

48. The SEC incorporates and realleges paragraphs 1 through 44 as if fully set forth herein.

49. As alleged above, defendants L2 and Oasis violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

50. At all relevant times, defendant Long was a control person of defendants L2 and Oasis for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

51. At all relevant times, defendant Long exercised power and control over defendants L2 and Oasis, including by managing and directing those entities, and by directing and participating in the acts constituting L2's and Oasis' violations of the securities laws.

52. By reason of the foregoing, defendant Long is liable as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for defendants L2's and Oasis' violations of the Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## **Relief Requested**

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Issue a permanent injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

### III.

Issue an order precluding each of the Defendants from participating, directly or

indirectly, including but not limited to through any entity they control, in any offering of penny stocks.

### IV.

Enter an Order requiring Defendants to disgorge, on a joint and several basis, the ill-gotten gains that they received, directly or indirectly, from the violations alleged herein, including prejudgment interest, pursuant to Sections 21(d)(3), (5) and (7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), (5), (7).

### V.

Order Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other relief as this Court deems appropriate.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: */s/Robert M. Moye*
Robert M. Moye (moyer@sec.gov)
Regina LaMonica (LaMonicaR@sec.gov)
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
(312) 353-1051

*Attorneys for Plaintiff, Securities and Exchange Commission*