# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 23 C 14260 |
| v. | Honorable Sunil R. Harjani |
| ADAM R. LONG, L2 CAPITAL, LLC, and OASIS CAPITAL, LLC, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

In this lawsuit, the Securities and Exchange Commission (SEC) brings this action against Defendants Adam R. Long, L2 Capital, LLC, and Oasis Capital, LLC alleging violations of Section 15(a)(1) of the Securities Exchange Act of 1934 by acting as unregistered securities dealers. Having considered the allegations of the Complaint, the Court finds that Defendant's motion [13] must be denied.

## Background

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In its Complaint, the SEC alleges that Defendants regularly acquired convertible notes from small companies that needed cash and often had minimal assets and negative cash flows, so Defendants were able to negotiate highly favorable terms for the convertible notes. Compl. [1] ¶ 13. The SEC states that Defendants targeted companies with high trading volumes to facilitate their rapid sale of shares after conversion. *Id.* ¶ 17. When, as happened in most cases, an issuer failed to make a payment, typically Defendants converted their shares and began selling them within three trading days of when the shares were deposited into their brokerage accounts, although the shares were frequently sold the same day or the very next day. *Id.* ¶¶ 18, 20–21. The SEC posits that Defendants acquired and sold more than 5.8 billion shares and generated at least $20 million in profits from these activities and that these profits were a result of selling shares acquired at a discount and not from the appreciation of the stocks' prices. *Id.* ¶¶ 3, 23. The SEC further alleges that Defendants held themselves out as dealers who were willing to purchase convertible notes through their websites, email and phone solicitations, and at approximately 20 industry conference appearances where Defendant Long met

with issuers and marketed Defendants' interest in purchasing convertible notes. *Id.* ¶¶ 25–28.  The SEC also claims that Long retained at least 5 independent contractors to help identify potential transactions.  *Id.* ¶ 39.  These allegations form the basis of Counts I and II of the Complaint.

## Count I

In Count I, the SEC alleges that Defendants failed to properly register as securities dealers as required by the Exchange Act.  Defendants move to dismiss, claiming that Congress, federal courts, and the SEC have long recognized the distinction between dealers and traders, and that they in fact acted as traders (with no registration requirement) because they were not investing customers' funds.

Under Section 15(a)(1) of the Exchange Act, it is "unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered" with the SEC. 15 U.S.C. § 78o(a)(1).  Courts in this district have long held that the "broker-dealer registration requirement is 'of the utmost importance in effecting the purposes of the Act,' as it enables the SEC to 'exercise discipline over those who may engage in the securities business,' and 'establishes necessary standards with respect to training, experience, and records.'"  *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) (quoting *SEC v. Benger*, 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010)).  However, only brokers and dealers are required to register with the SEC.

The Exchange Act broadly defines dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A).  The Defendants argue that they qualify for the 'trader exception' which excludes from the definition of dealer "a person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B).  The Act does not define either of the important terms in these clauses – "the business of buying and selling securities" or "part of a regular business."

Turning first to plain meaning, both the definition of dealer and the exception for traders emphasize that a broker is someone in the regular "business" of buying and selling securities.  The Exchange Act does not define the term "business," but Black's Law Dictionary defines it as "a commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." Black's Law Dictionary (11th ed. 2019).  This definition does not require the buying and selling of securities be pursuant to a customer request because the focus is on the regularity of the conduct and the goal of securing a profit.  In addition, the definition of dealer in the Exchange Act itself specifically refers to buying and selling securities "for such person's own account," with no mention of trading for others. 15 U.S.C. § 78c(a)(5)(A).  As a result, the Court finds, with little trouble, that the plain meaning of dealer in the Exchange Act includes a person engaged in the business of buying and selling securities for their own profit, so long as it is part of a regular business.

Further bolstering this reading is a recent opinion by the Eleventh Circuit Court of Appeals. In *SEC v. Keener*, the defendant made $7.7 million in profits from selling billions of shares of converted stock, which he obtained at a discount. 102 F.4th 1328, 1332 (11th Cir. 2024). To do this, the defendant held himself out as being willing to buy convertible debt. He also maintained a public website and had multiple employees who identified microcap companies in need of financing. Like the Defendants here, the defendant in *Keener* also argued that he was not a dealer because he did not effectuate securities orders for customers and that market participants and Congress historically presumed that dealers handled orders for customers. *Id.* at 1334. The Eleventh Circuit found that a "dealer is 'a professional market-maker' who 'matches the buyers and sellers of securities' and whose business model depends on 'his volume of buying and selling because he profits from executing trades.'" *Id.* at 1333 (quoting *SEC v. Ibrahim Almagarby*, 92 F.4th 1306, 1315 (11th Cir. 2024)). The Eleventh Circuit further explained "that 'a customer requirement has no grounding in the statutory text' of the Exchange Act." *Id.* at 1334 (quoting *Almagarby*, 92 F.4th at 1318). The appellate court held that, while a dealer may make trades for customers, "the Exchange Act makes no mention of a customer-facing role in its statutory definition" and instead "defines dealers by their function, as being '*in the business* of buying and selling securities[.]'" *Id.* (quoting 15 U.S.C. § 78c(a)(5)(A)) (italics in original). The Eleventh Circuit also found that "since the enactment of section 15(a), the dealer definition has been understood to cover a trader who has *no customers* but merely trades for his own account through a broker, so long [as] his operations are sufficiently extensive to be regarded as a regular business." *Id.* at 1334–35 (internal quotations omitted) (italics in original). Indeed, the appellate court reasoned that the crucial element of the term dealer is whether the individual is in the business of buying and selling securities and not whether the dealer is acting on behalf of customers. The Eleventh Circuit held that the "nature, volume, regularity, and frequency" of defendant's transactions rendered the defendant in that case a dealer. *Id.* at 1334.

The Eleventh Circuit's approach is not only persuasive, but also consistent with case law within this district. In *SEC v. Fife*, the SEC alleged that the defendants operated a business of buying convertible notes from penny stock issuers and converting those notes to newly issued shares of stock that were heavily discounted from the market rate, netting them profits of approximately $61 million. 2021 WL 5998525, at *1 (N.D. Ill. Dec. 20, 2021). The SEC alleged that the defendants held themselves out to the public as being willing to buy convertible notes, operated a website to advertise, and directly solicited microcap issuers through cold-calls and emails and at conferences. Similar to the allegations here, in *Fife* the defendants sought out issuers with minimal assets, negative cash flow, historically strong trading volumes, and a large number of authorized but unissued shares. In *Fife*, the defendants and the SEC also disputed the definition of "dealer" within the Exchange Act, with defendants arguing it should mean "one who buys and sells stocks 'without altering their condition'" and the SEC arguing it should mean "one who buys to sell,—not one who buys to keep, or makes to sell." *Id.* at *5. The district judge evaluated all of the district court cases that had similar allegations and had confronted this issue, and found that every district court allowed the action to proceed past the pleading stage. *Id.* at *5–6. The district court found that the salient points for each of these decisions included "(a) the regularity of Defendants' participation in securities transactions and (b) the level of participation, whether

3

measured by volume of trades or profit realized." *Id.* at *6. The district court found that at this stage in the case, the SEC's allegations sufficiently alleged that the defendants were dealers.

In *SEC v. River North Equity LLC*, the defendants similarly argued that the SEC failed to sufficiently allege that their conduct aligned with various SEC no-action letters and other guidance defining the term dealer. 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019). The district court found that the factors from various SEC no-action letters and other guidance, were not exclusive, nor did they function as a checklist that the court must consider when deciding a motion to dismiss. Instead, the issue of whether and which factors "are met is necessarily a fact-based inquiry best reserved for summary judgment or trial." *Id.*

Based on both the plain meaning of the statute and persuasive reasoning from these cases, whether Defendants were dealers turns not on whether the SEC alleged Defendants were investing on behalf of customers, but if the SEC sufficiently alleged that Defendants' conduct was of the nature, regularity, and volume to indicate they were engaged in the business of buying and selling securities. Here, the SEC alleges that Defendants generated at least $20 million in profits from selling more than 5.8 billion shares of converted stock. Compl. [1] ¶ 3. To do this Defendants targeted companies with minimal assets, negative cash flows, and high trading volumes to enable them to negotiate highly favorable terms for the convertible notes and facilitate their rapid sale of shares after conversion. *Id.* ¶¶ 13, 17. The SEC alleges that Defendants were willing to purchase convertible notes through their websites, email and phone solicitations, and at industry conferences, and that Long retained at least 5 independent contractors to help identify potential transactions. *Id.* ¶¶ 25–29. These allegations are substantially similar to those in *Keener* and *Fife* in terms of the volume of transactions and the profits obtained. Further, the SEC alleges that Defendants were conducting the same type of operation of seeking out microcap issuers with negative cash flows, minimal assets, and high trading volumes as alleged in *Keener* and *Fife*. Meaning that Defendants' business model was dependent on acquiring a high volume of shares at a discount and then rapidly selling them to make a profit. The frequency and volume of Defendants' trades, along with their business model based on routinely targeting a specific type of microcap issuer for a specific type of transaction, makes this the regular business of the Defendants. Thus, the SEC has sufficiently alleged that Defendants were in the business of buying and selling securities because of the nature of the operations and the repeated transactions and volume of shares sold, which makes them dealers who should have registered with the SEC.

## Count II

In Count II, the SEC alleges that Defendant Long was the control person for L2 and Oasis and exercised power and control over them during their violations of Section 15(a)(1). Defendants argue that Count II should be dismissed because the SEC failed to allege the primary cause of action against the Defendants in Count I. As the Court found that the SEC adequately alleges a violation of Section 15(a) in Count I, the Court denies Defendants' motion to dismiss Count II.

4

## Conclusion

For the reasons stated above, Defendant's motion to dismiss [13] is denied.

**SO ORDERED.**

Dated:  June 25, 2024

Sunil R. Harjani
United States District Judge